Melissa B. Hagan (SBN: 17225200 (Texas))
UNION PACIFIC RAILROAD COMPANY
Law Department
1001 McKinney St., Ste. 900
Houston, Texas 77002
Direct:     713.220.3207
Fax:        713.220.3215
mbhagan@up.com

Adrian L. Randolph (SBN: 133577)
Michael L. Johnson (SBN: 88884)
UNION PACIFIC RAILROAD COMPANY
Law Department
10031 Foothills Boulevard, Suite 200
Roseville, CA  95747
General:    916-789-6400
Direct:     916-789-6231
Fax:        916-789-6227

Attorneys for Defendants
UNION PACIFIC RAILROAD COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHERN CALIFORNIA WATCH, a non-profit Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, WEST COAST METALS INC. and DOES 1 – 10, Inclusive,<br><br>Defendants. | Case No.:CV-01256-MMC<br><br>**STATEMENT OF RECENT OPINION**<br><br>Date: **August 29, 2008**<br>Time: **9:00 A.M**<br>Dept: **Courtroom 7**<br>Judge: **Honorable Maxine M. Chesney** |

**STATEMENT OF RECENT OPINION**

On August 6, 2008, the Ninth Circuit issued its opinion in *Center for Biological Diversity v Marina Point Development Co.,* No. 06-56193, 07-55243, 07-56574, ---- F.3d ----, 2008 WL 3009692 (9th Cir. August 6, 2008).  The decision is attached to the Statement of Recent Opinion.

-1-

DATED: August 25, 2008

UNION PACIFIC RAILROAD COMPANY

By: /S/ Melissa B. Hagan

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY

Westlaw.

2008 WL 3009692                                                                                          Page 1
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
**(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))**

HUnited States Court of Appeals,
Ninth Circuit.
CENTER FOR BIOLOGICAL DIVERSITY; Friends of Fawnskin, Plaintiffs-Appellees,
v.
MARINA POINT DEVELOPMENT CO.; Okon Development Co.; Oko Investments, Inc.;
Northshore Development Associates, L.P., e/s/a North Shore Development
Associates, L.P.; Site Design Associates, Inc.; Ken Discenza; VDLP Marina
Point; Venwest Marina Point, Inc., e/s/a Venture West Inc.; Irving Okovita,
Defendants-Appellants.
Center for Biological Diversity; Friends of Fawnskin, Plaintiffs-Appellees,
v.
Marina Point Development Co.; Okon Development Co.; Oko Investments, Inc.;
Northshore Development Associates, L.P., e/s/a North Shore Development
Associates, L.P.; Site Design Associates, Inc.; Ken Discenza; VDLP Marina
Point; Venwest Marina Point, Inc., e/s/a Venture West Inc.; Irving Okovita,
Defendants-Appellants.
Center for Biological Diversity; Friends of Fawnskin, Plaintiffs-Appellees,
v.
Marina Point Development Co.; Okon Development Co.; Oko Investments, Inc.;
Northshore Development Associates, L.P., e/s/a North Shore Development
Associates, L.P.; Site Design Associates, Inc.; Ken Discenza; VDLP Marina
Point; Venwest Marina Point, Inc., e/s/a Venture West Inc.; Irving Okovita,
Defendants-Appellants.
**Nos. 06-56193, 07-55243, 07-56574.**

Argued and Submitted July 14, 2008.
Filed Aug. 6, 2008.

**Background:** Nonprofit public interest conservation organization and coalition of local residents of and visitors to town that aimed to preserve town's character, environment, and wildlife brought action against developer to enjoin the development of a residential condominium project on shoreline of lake, alleging violation of the Clean Water Act and the Endangered Species Act. The United States District Court for the Central District of California, Manuel L. Real, J., 434 F.Supp.2d 789, entered judgment against defendants, and denied defendants' motion for new trial, 2006 WL 2403937. Defendants appealed.

**Holdings:** The Court of Appeals, Fernandez, Circuit Judge, held that:
(1) notices of intent to sue were insufficient under Clean Water Act;
(2) delisting of bald eagle rendered Endangered Species Act claim moot; and
(3) plaintiffs were not entitled to attorney fees.
Vacated and remanded.

**[1] Federal Courts** ☞776

170Bk776 Most Cited Cases
Court of Appeals reviews issues of the district court's subject matter jurisdiction de novo.

**[2] Environmental Law** ☞708
149Ek708 Most Cited Cases
Court of Appeals reviews de novo the question of whether the notice under the Clean Water Act was adequate. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

**[3] Environmental Law** ☞659
149Ek659 Most Cited Cases
Giving of a 60-day notice of intent to sue under Clean Water Act is not simply a desideratum; it is a jurisdictional necessity. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

**[4] Environmental Law** ☞659
149Ek659 Most Cited Cases
Under a literal reading of the Clean Water Act, compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

**[5] Environmental Law** ☞659
149Ek659 Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2008 WL 3009692                                                                                                    Page 2
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
**(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))**

When a party does not fulfill threshold requirement of filing 60-day notice of
intent to sue under Clean Water Act, the district court must dismiss the action as barred by the terms of the statute. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

[6] **Environmental Law** 659
149Ek659 Most Cited Cases
Notice of intent to sue under Clean Water Act is not just an annoying piece of paper intended as a stumbling block for people who want to sue; it is purposive in nature and the purpose is to accomplish corrections where needed without the necessity of a citizen action. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

[7] **Environmental Law** 659
149Ek659 Most Cited Cases
Purpose of notice of intent to sue to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Clean Water Act and thus likewise render unnecessary a citizen suit. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

[8] **Environmental Law** 226
149Ek226 Most Cited Cases
Citizen suits are proper under Clean Water Act only if the federal, state, and local agencies fail to exercise their enforcement responsibility. Clean Water Act, § 505(a), 33 U.S.C.A. § 1365(a).

[9] **Environmental Law** 659
149Ek659 Most Cited Cases
Notices of intent to sue developer under Clean Water Act, which declared that Act was being violated by activities placing enormous amounts of fill into lake and by grading, were insufficient to satisfy 60-day notice requirement under citizen suit provision of Clean Water Act; notices did not mention any claims under pollutant discharge provision of Act, did not give any detail regarding what wetlands were allegedly being affected or how, long before any action was filed and before 60-day notice period had gone by, the United States Army Corps of Engineers issued a cease and desist order against developer, and later acted to effect ongoing repairs for any problems caused by past activities. Clean Water Act, § 505(b)(1)(A), 33 U.S.C.A. § 1365(b)(1)(A).

[10] **Environmental Law** 663
149Ek663 Most Cited Cases
Delisting of bald eagle from endangered species list by United States Fish and Wildlife Service rendered moot an Endangered Species Act claim, brought by nonprofit public interest conservation organization and coalition of local residents of and visitors to town that aimed to preserve town's character, environment, and wildlife, against developer to enjoin the development of residential condominium project on shoreline of lake. Endangered Species Act of 1973, § 3(19), 16 U.S.C.A. § 1532(19); 50 C.F.R. § 17.31.

[11] **Federal Courts** 12.1
170Bk12.1 Most Cited Cases
To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[12] **Federal Courts** 12.1
170Bk12.1 Most Cited Cases
A claim is "moot" when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.

[13] **Federal Courts** 12.1
170Bk12.1 Most Cited Cases
The basic question as to mootness is whether there exists a present controversy as to which effective relief can be granted.

[14] **Environmental Law** 722
149Ek722 Most Cited Cases
To be entitled to an award of attorney fees under Endangered Species Act (ESA), a party must prevail. Endangered Species Act of 1973, § 11(g)(4), 16 U.S.C.A. § 1540(g)(4).

[15] **Environmental Law** 529
149Ek529 Most Cited Cases

[15] **Environmental Law** 722
149Ek722 Most Cited Cases
Evidence was insufficient to support a determination that developer of residential condominium project on shoreline of lake caused, or would have caused, a "take" of a bald eagle, or that there was some sort of rational causal connection between developer's activities and any disruption of the behavioral patterns

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-01256-MMC    Document 36    Filed 08/25/2008    Page 5 of 12

2008 WL 3009692                                                                                              Page 3
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))

of the bald eagle, as required to establish a violation of the Endangered Species Act (ESA) and entitle plaintiffs to attorney fees. Endangered Species Act of 1973, §§ 3(19), 9(a)(1)(B), 10(a)(1)(B), 11(g)(4), 16 U.S.C.A. §§ 1532(19), 1538(a)(1)(B), 1539(a)(1)(B), 1540(g)(4).

Robert D. Crockett, Latham & Watkins LLP, Los Angeles, CA, for the defendants-appellants.

Bernice Conn, Robins, Kaplan, Miller & Ciresi L.L.P., Los Angeles, CA, for the plaintiffs-appellees.

Appeal from the United States District Court for the Central District of California; Manuel L. Real, District Judge, Presiding. D.C. Nos. CV-04-07036-R, CV-04-07036-R, CV-04-07036-R-RZ.

Before: FERDINAND F. FERNANDEZ, PAMELA ANN RYMER, and ANDREW J. KLEINFELD, Circuit Judges.

FERNANDEZ, Circuit Judge:

*1 Marina Point Development Associates, Okon Development Co., Oko Investments, Inc., Northshore Development Associates, L.P., Irving Okovita, Site Design Associates, Inc., Ken Discenza, VDLP Marina Point L.P. and Venwest Marina Point, Inc. (collectively "Marina Point") appeal the district court's judgment on the merits in favor of Center for Biological Diversity and Friends of Fawnskin (collectively "the Center") on their claims under the Clean Water Act (CWA), [FN1] and under the Endangered Species Act (ESA). [FN2] Marina Point also appeals the district court's order awarding attorney fees to the Center and the district court's contempt order. We vacate the district court's judgment on the merits and instruct it to dismiss for lack of jurisdiction. We reverse the order awarding attorney fees and the contempt order.

BACKGROUND

Marina Point's 12.51 acre development project site is located on the north shore of Big Bear Lake and the east shore of Grout Bay in the San Bernardino Mountains. The property extends from the edge of the trees to the lake. The land area, known as "Cluster Pines," had functioned as a tavern, recreational vehicle park, campground, and licensed commercial marina from the early 1950's until 2001. Marina Point acquired the property in 1989 in order to develop a residential condominium project upon it.

After acquiring the property, Marina Point began securing permits. The United States Army Corps of Engineers (Corps) solicited public comment, and ultimately concluded that the planned development could go forward. The Corps stated that the United States Fish and Wildlife Service (FWS) had ultimately determined that the upland portion of the site was not a suitable bald eagle habitat, and that a consultation pursuant to 16 U.S.C. § 1536 was not required. On September 10, 1991, the Corps granted a permit to Marina Point which authorized it to strengthen the existing shoreline. See 33 U.S.C. § 1344.

The permit authorized Marina Point to dredge the adjacent shoreline and the interior of the existing marina, and to use the dredged material as fill for building pads on the land. Marina Point was forbidden, however, from placing rip-rap [FN3] at elevations below lake bottom contours, from depositing sand below the ordinary high water mark, and from transferring fill or structures to neighboring wetlands. In order to protect bald eagles' seasonal behavioral habits, it was also barred from working during the winter months. Besides the permit from the Corps, Marina Point secured permits from the County of San Bernardino, the California Department of Fish and Game, and Big Bear Municipal Water District. In addition, the California Regional Water Quality Control Board issued a water discharge requirements order.

Work began in May 2002, but Marina Point's permit from the Corps expired on September 10, 2002, after several extensions. Marina Point graded the land area before the permit expired. On October 7, 2002, Marina Point's contractor also used a grader to remove trees on the land. Moreover, the Corps allowed Marina Point to proceed with dredging without a permit as long as that did not result in more than "incidental fallback" of soil within the Corps' jurisdiction, but the Corps disallowed any pushing or pulling of materials along the lake bed.

*2 Work resumed at the site in June of 2003 and went on until about July 23, 2003, when the Corps issued a Cease and Desist Order to Marina Point. The Corps' stated reasons for the order were that Marina Point's use of a dragline bucket, rather than a clamshell dredge, caused more than incidental fallback of soil,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and that the contractor had been temporarily stockpiling material below the ordinary high water mark.

In September 2003, Marina Point requested interim approval to resume work. The Corps then issued an Initial Corrective Measure Order (ICMO) on October 16, 2003, which required Marina Point to complete specific remedial actions by December 1, 2003. That deadline was extended to December 24, 2003, because of unforeseen difficulties, such as a forest fire in the area.

In the meantime, the Center had sent a number of notices of intent to commence a citizen's action against Marina Point. [FN4] The Center then filed this action on April 7, 2004.

The district court denied Marina Point's motion to dismiss for lack of subject matter jurisdiction. The case then proceeded to trial, and on June 12, 2006, the district court issued an opinion [FN5] in which it determined that Marina Point had violated the CWA and the ESA. Its ensuing judgment on August 21, 2006, permanently enjoined Marina Point from any development on the site without the court's prior authorization, directed Marina Point to follow any remedial orders from the Corps, and imposed a statutory penalty upon it. Marina Point appealed on August 22, 2006.

Thereafter, the district court awarded attorney fees to the Center as the prevailing party under the CWA and the ESA. Marina Point appealed that ruling on February 15, 2007.

Still later, on November 7, 2007, the district court determined that Marina Point was in contempt and issued various orders as a result. Marina Point appealed that decision on November 19, 2007.

## STANDARD OF REVIEW

[1][2] We review issues of the district court's subject matter jurisdiction de novo. *See Satey v. JPMorgan Chase & Co.,* 521 F.3d 1087, 1090 (9th Cir.2008). We also review de novo the question of whether the Center's notice under the CWA was adequate. *See Natural Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 995-96 (9th Cir.2000).

## JURISDICTION

At the outset, we must consider whether there was federal jurisdiction over this dispute when the complaint was filed, and whether jurisdiction still remains. For the reasons discussed below, the answer is no.

I. Clean Water Act.

In general, actions can be brought by private persons and entities for the purpose of enforcing many of the provisions of the CWA. *See* 33 U.S.C. § 1365(a). That is usually referred to as the citizen suit provision. However, before an action is commenced, the citizen must give a 60-day notice of intent to sue. *Id.* § 1365(b)(1)(A). In fact, absent that notice, the action is prohibited. *Id.*

The notice serves important public purposes; this kind of litigation is not like a mere private dispute. That is underscored by the fact that the notice must be given not only to the alleged violator, [FN6] but also to the Administrator, [FN7] and to the State where the alleged violation occurred. [FN8] The Supreme Court has explicated the purpose behind the requirement of notice in this kind of litigation. As it has pointed out:

*3 [T]he legislative history indicates an intent to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits. Requiring citizens to comply with the notice and delay requirements serves this congressional goal in two ways. First, notice allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits.... Second, notice gives the alleged violator "an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." This policy would be frustrated if citizens could immediately bring suit without involving federal or state enforcement agencies. Giving full effect to the words of the statute preserves the compromise struck by Congress.

*Hallstrom v. Tillamook County,* 493 U.S. 20, 29, 110 S.Ct. 304, 310, 107 L.Ed.2d 237 (1989) (citations omitted). That has special relevance here because, as we will explain further, this case is a perfect example of speedy government enforcement; action by the Corps which, in large measure, obviated the need for a citizen suit regarding Marina Point's alleged

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-01256-MMC    Document 36    Filed 08/25/2008    Page 7 of 12

2008 WL 3009692                                                                                                    Page 5
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))

violations.

[3][4][5][6][7][8] Moreover, the giving of a 60-day notice is not simply a desideratum; it is a jurisdictional necessity. See *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.,* 375 F.3d 913, 916 (9th Cir.2004); *Natural Res. Def. Council,* 236 F.3d at 995. As the Supreme Court has put it: "Under a literal reading of the statute, compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit." *Hallstrom,* 493 U.S. at 26, 110 S.Ct. at 309. And the literal reading is what controls. When a party does not fulfill that threshold requirement, "the district court must dismiss the action as barred by the terms of the statute." *Id.* at 33, 110 S.Ct. at 312; *see also Waterkeepers,* 375 F.3d at 916. That is to say, the notice is not just an annoying piece of paper intended as a stumbling block for people who want to sue; it is purposive in nature and the purpose is to accomplish corrections where needed without the necessity of a citizen action. As the Supreme Court has said in the similar context of claims for past violations:

> It follows logically that the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit. If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous. Indeed, respondents, in propounding their interpretation of the Act, can think of no reason for Congress to require such notice other than that "it seemed right" to inform an alleged violator that it was about to be sued.

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60, 108 S.Ct. 376, 382-83, 98 L.Ed.2d 306 (1987). Here, too, if a citizen suit were brought when correction had already been undertaken at the behest of a governmental agency, the notice would become gratuitous. But, as the Court went on to say: "citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.' " *Id.* at 60, 108 S.Ct. at 383 (citation omitted).

*4 We must, therefore, keep those overarching public purposes in mind as we approach the controversy before us. To accomplish them, the notice must be sufficient in itself and, perforce, if the desired change has been properly delineated and has been accomplished, that, too, obviates the need or purpose of a citizen suit. That does not exactly say just what a sufficiently detailed notice might be, but we have guidance in that area also.

We start with the requirements adopted by the EPA. Those are as follows:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). It is from that specific and clear statement that our later cases have proceeded.

We have sometimes been slightly forgiving to plaintiffs in this area, but even at our most lenient we have never abandoned the requirement that there be a true notice that tells a target precisely what it allegedly did wrong, and when. The target is not required to play a guessing game in that respect. In one case, we determined that where the difficulty was a kind of negative--the failure to prepare a plan to avoid pollution--a specific date of wrongdoing could not be given because there was no specific date. *Natural Res. Def. Council,* 236 F.3d at 996. We chose not to demand the impossible. Thus, the notice sufficed.

In two later cases in 2002, we also relaxed to some extent. In one of the cases, the plaintiff's notice set forth a series of twelve specific violations on specific dates, but the complaint included numerous other violations within the same time frame. *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy,* 305 F.3d 943, 951-52 (9th Cir.2002). The defendant complained about the added dates, but we said that the notice certainly alerted the defendant to what it was doing wrong and the inclusion of specific dates was, under the circumstances, enough to allow an action regarding discharges on other dates at or about the same time and of the same ilk as those listed. *Id.* at 953. As we put it, "[b]ased on the fact that the **violations originated from the same source, were of the same nature, and were easily identifiable, we find that [the plaintiffs']** notice was adequate." *Id.* The other case presented the same kind of issue.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-01256-MMC   Document 36   Filed 08/25/2008   Page 8 of 12

2008 WL 3009692                                                                                                    Page 6
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))

There, fourteen dates of alleged wrongdoing were listed in the notice, and the notice also stated that while all dates were not available to the plaintiff, the wrongdoing occurred on each date that ships were loaded at the defendant's facility. *S.F. BayKeeper, Inc. v. Tosco Corp.,* 309 F.3d 1153, 1158 (9th Cir.2002). We found that the detail was sufficient under the circumstances because from the specifics given, the defendants could readily ascertain "the nature of the alleged violations, as well as the likely dates of those violations." *Id.* at 1159.

*5 We followed the same general approach in a later case where the defendant was accused in a detailed ten-page letter of improper discharges during each and every rain event of a certain intensity, and the days of that rain event intensity were listed. *See Waterkeepers N. Cal.,* 375 F.3d at 917. We declared that to be sufficient detail. *Id.* at 917-18.

On the other hand, when a notice told the defendant that it had committed one specific violation, the defendant was not "required to speculate as to all possible attacks ... that might be added to a citizen suit" at a later time. *ONRC Action v. Columbia Plywood, Inc.,* 286 F.3d 1137, 1143 (9th Cir.2002). We found that the notice was insufficient, except as to timeliness, and that the claim was in error. We then explained: "[b]ecause timeliness was the sole challenge raised in the notice, it was reasonable to conclude that no action in response to ONRC's 60-day notice was required." *Id.* Also, echoing the Supreme Court's concerns, we went on to state:
> Had ONRC's notice specified its other theories, either Oregon or the EPA might well have decided that those theories had sufficient merit to call for agency action. Were we to exercise jurisdiction over such claims when they were not disclosed by the citizen suit notice, we would usurp the right of the applicable governmental agencies to evaluate and act upon the merits of the claims prior to judicial review.

*Id.* at 1144.

Earlier on, when faced with a notice that did not list all of the complaining parties, we declared that for purposes of an action by those not listed, the notice was fatally insufficient. *Wash. Trout v. McCain Foods, Inc.,* 45 F.3d 1351, 1354-55 (9th Cir.1995). We did so despite an assertion by the plaintiffs that the error was technical and we should not be overly strict. *Id.* at 1354. We rejected that notion. *Id.* By the way, the notice in that case also had a deficiency regarding dates, but we did not address that. *See id.* at 1352.

In short, the requirements set forth in 40 C.F.R. § 135.3(a) are not to be looked upon as mere technicalities to be accepted with cold reserve and embraced with velleity. They are to be taken seriously as a means of carrying out important public policies. Our deviations from their precise language have been minor.

[9] When those authorities and their principles are used as a yardstick, it is apparent that the notices in this case were not sufficient to support district court jurisdiction. An analysis of the notices will explain why that is so. The first of the notices on June 30, 2003, declared that "Section 404 of the CWA" [FN9] was being violated by activities that began June 17, 2003, which activities were placing "enormous amounts of fill" into the lake and were accompanied by grading below the ordinary high water mark. The notice did not mention any claims under § 402 of the CWA, [FN10] nor did it give any detail whatsoever regarding just what "wetlands" were allegedly being affected or how. [FN11] It also gave no other specific dates. The second of the notices, dated July 17, 2003, is of the same ilk. It gives little more detail about the activities regarding the lake itself and no more detail regarding wetlands or § 402. Those notices are questionable regarding § 404 violations and insufficient regarding wetlands and any claimed § 402 violations. [FN12]

*6 What is of even more significance, however, is that long before any action was filed and, in fact, before 60 days had gone by, the Corps issued its cease and desist order on July 23, 2003, and all activity by Marina Point regarding the lake stopped as it had to. That, in fact, is reflected in the Center's third notice, on August 8, 2003, wherein it stated that the activities it complained of occurred each day from June 17, 2003, through July 25, 2003.

The third notice then goes on to claim violations in language even less descriptive than that used in the prior notices. It refers only to piles of material that were causing discharges below the ordinary high water mark of the lake, and declares that the situation could be made worse should it rain. As we see it, that level of generality, again, is not really compatible with

2008 WL 3009692                                                                                                                      Page 7
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
**(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))**

the purposes of the notice requirements under the CWA.

But, even if it were sufficient in that regard, here again the Corps stepped in to obviate and ameliorate any problems. Just slightly over 60 days later and before commencement of this action, the Corps issued its October 16, 2003, ICMO authorizing and directing Marina Point to perform and complete a number of corrective measures by December 1, 2003, for the purpose of protecting the lake from the kinds of problems alluded to by the August 8, 2003, notice. It is also notable that although the Corps' ICMO was issued nine days after the 60 days had expired, Marina Point had applied for permission to undertake that work on September 25, 2003, which was before the 60 days had run. Of course, Marina Point could not have been expected to actually begin correcting perceived § 404 problems regarding the lake without obtaining permission from the Corps. In short, as weak as it was, the notice had done its job, if, indeed, the job was not being done without the notice.

That leaves the December 1, 2003, notice, which is, if anything, even less informative and helpful than the earlier notices. Principally, it asserts that Marina Point was going forward without the coverage of the ICMO because that document said that work was to cease by December 1, 2003. However, the Center was in error because, due to problems that had developed, the Corps, after consultation with FWS, extended the date to December 24, 2003. As it was, the work ceased by December 17, 2003. It is difficult to see what Marina Point was supposed to do about that portion of the notice. Probably nothing. See *Columbia Plywood,* 286 F.3d at 1143. Beyond that, the Center indicated that it could not really tell if the work was proceeding pursuant to the terms of the ICMO. That, too, was hardly the kind of notice that the CWA contemplates.

In fine, the notices were insufficient at their inception regarding wetlands and possible § 402 violations, and to the extent that they were sufficient, if barely so, as to possible § 404 violations, their efficiency was limited by prompt Corps and Marina Point action. That is to say, in light of the defects in the notices, and in light of the fact that the Corps and Marina Point did act to cease the activities that the Center claimed were wrongful and even acted to effect ongoing repairs for any problems caused by past activities, the district court did not have jurisdiction to hear the CWA action. It should have dismissed the action at the outset. Thus, in this respect the district court's judgment must fall for lack of jurisdiction, and must be vacated.

II. Endangered Species Act

*7 Plaintiffs were also required to give notice before bringing an action under the ESA. See 16 U.S.C. § 1540(g)(2). There is no claim that the notice was not sufficient in that respect, and it does appear to be proper. However, there is a different problem here--mootness.

The ESA allows a citizen suit for the purpose of obtaining injunctive relief only. *Id.* at (g)(1)(A). Of course, that is forward looking, and is intended to prevent a defendant from taking an endangered or threatened species. See *id.* § 1538(a)(1)(B); 50 C.F.R. § 17.31. That means that a person may not harass or harm a listed species. See 16 U.S.C. § 1532(19). Here, the claim was that Marina Point's activities and planned project would harass bald eagles by disrupting their "normal behavioral patterns." See 50 C.F.R. § 17.3.

[10] The problem is that less than a year after the district court's judgment was issued [FN13] and, of course, while this case was still on appeal, the FWS delisted the bald eagle. [FN14] Therefore, whatever might have been the case previously, Marina Point cannot violate the ESA regarding the bald eagle, regardless of any decision we render here.

[11][12][13] As we explained in *Council of Ins. Agents & Brokers v. Molasky-Arman,* 522 F.3d 925, 933 (9th Cir.2008) (citations omitted):
> "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." "A claim is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. The basic question is whether there exists a present controversy as to which effective relief can be granted."

Because the bald eagle has been delisted, no present controversy can remain.

In *Humane Society of the United States v. Kempthorne,* 527 F.3d 181 (D.C.Cir.2008), the Court

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-01256-MMC   Document 36   Filed 08/25/2008   Page 10 of 12

2008 WL 3009692                                                                                  Page 8
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
**(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))**

of Appeals for the District of Columbia Circuit was faced with a similar situation. In that case, while litigation regarding protection for the gray wolf was on appeal, the wolf was removed from the endangered species list. *Id.* at 182. That being so, the parties agreed that the case had necessarily become moot, and the court accepted that agreement. *Id.* The specific reason for that was not explicated but, no doubt, it appeared obvious to all concerned that there was no further work to be served by an injunction. *Cf. Ctr. for Biological Diversity v. Norton,* 254 F.3d 833, 837 n. 4 (9th Cir.2001) (stating that where suit brought to force action regarding a frog, once the frog was listed the case became moot).

The same appears here. Now that the bald eagle has been delisted, nothing we decide can properly give the Center the relief it sought. If the district court erred, the injunction must fall, but if the district court was correct, the injunction must still fall because no activities by Marina Point could constitute a take within the meaning of the ESA. In fact, in a letter to this court, the Center has conceded mootness.

*8 Thus, there is no further jurisdiction to proceed, and the district court's judgment under the ESA must be vacated.

### OTHER ISSUES
I. Attorney Fees

The district court awarded attorney fees to the Center and against Marina Point on both the CWA and the ESA claims. It did not segregate the two. Nevertheless, because, as more particularly set forth below, fees cannot be awarded on either claim, the entire award must fall.

A. CWA

The CWA provides for an award of attorney fees "to any prevailing or substantially prevailing party" when the court deems that to be appropriate. 33 U.S.C. § 1365(d). As we have already discussed, the district court was without subject matter jurisdiction over the CWA claim. Therefore, the award of fees must fall to the extent that it is based upon that claim.

B. ESA

[14] The ESA provides for an award of attorney fees "whenever the court determines such award is appropriate." 16 U.S.C. § 1540(g)(4). While that is not the typical prevailing party language, it is apparent that it must be taken to mean and be limited to an award of fees to parties who prevail. *See Marbled Murrelet v. Babbitt,* 182 F.3d 1091, 1095 (9th Cir.1999); *see also Ruckelshaus v. Sierra Club,* 463 U.S. 680, 693-94, 103 S.Ct. 3274, 3282, 77 L.Ed.2d 938 (1983) (in a Clean Air Act case, with the same language as that in the ESA, absent "some degree of success on the merits" an award of attorney fees is not "appropriate."). Thus, to be entitled to an award, the Center must be a prevailing party.

The ESA claim became moot due to the delisting of the bald eagle. Still, it can be cogently argued that if the district court judgment were valid and enforceable as to that claim, the period between its issuance (April 21, 2006) and the date of delisting (July 9, 2007), gave relief and bald eagle protection, so some award may well be appropriate. *See Richard S. v. Dep't of Developmental Servs. of Cal.,* 317 F.3d 1080, 1088-89 (9th Cir.2003) (holding that fact that case becomes moot does not eliminate right to fees); *Williams v. Alioto,* 625 F.2d 845, 847-48 (9th Cir.1980) (per curiam) (same).

[15] However, we have carefully reviewed the record and we are satisfied that the evidence cannot support a determination [FN15] that Marina Point caused, or would have caused, a take of a bald eagle. *See* 16 U.S.C. §§ 1538(a)(1)(B), 1539(a)(1)(B); 50 C.F.R. § 17.31(a); *see also Sw. Ctr. for Biological Diversity v. Berg,* 268 F.3d 810, 814 (9th Cir.2001). The statute defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). There is no claim that Marina Point harmed bald eagles. It is claimed that Marina Point harassed, or would harass, them. Harass means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns...." 50 C.F.R. § 17.3. However, taking all of the evidence together, there was no basis for a finding that there was some sort of rational causal connection between Marina Point's activities and any disruption of the behavioral patterns of the bald eagle. *See Cold Mountain v. Garber,* 375 F.3d 884, 889-90 (9th Cir.2004); *Defenders of Wildlife v. Bernal,* 204 F.3d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-01256-MMC   Document 36   Filed 08/25/2008   Page 11 of 12

2008 WL 3009692                                                                 Page 9
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))

920, 925-27 (9th Cir.2000); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,* 898 F.2d 1410, 1419-20 (9th Cir.1990). That being so, the district court's judgment in favor of the Center would have to have been reversed, even if the claim had not become moot. Because of that, it cannot be said that the Center ultimately prevailed on the merits. [FN16]

**\*9** Therefore, the judgment must fall in its entirety, and the attorney fees awarded to the Center must fall along with it.

II. Contempt

Because, as we have already demonstrated, the district court's August 21, 2006, judgment must fall for lack of jurisdiction, whether the contempt order expanded or merely explicated the judgment, [FN17] that order must inexorably fall along with the judgment. [FN18] In addition, to the extent that the contempt order was premised on violations of the ESA injunction, it fails because that injunction would be reversed on the merits were it not moot. *Kirkland v. Legion Ins. Co.,* 343 F.3d 1135, 1142 (9th Cir.2003) ("The validity of a contempt adjudication is based on the legitimacy of the underlying order."); *Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d 1390, 1394 (9th Cir.1991); *Scott & Fetzer Co. v. Dile,* 643 F.2d 670, 675 (9th Cir.1981). We will, therefore, reverse it.

CONCLUSION

The district court determined that Marina Point had violated the CWA and had either violated or would violate the ESA. *See Center I,* 434 F.Supp.2d at 795-98. However, because it lacked jurisdiction over the CWA claims and because the ESA claims have become moot, we vacate its judgment and remand with directions to dismiss for lack of jurisdiction. Concomitantly, we reverse the award of attorney fees and the contempt order.

Judgment After Trial on the merits (No. 06-56193) VACATED and REMANDED with instructions to DISMISS for mootness (ESA) and lack of jurisdiction (CWA). [FN19] Order Awarding Attorney Fees (No. 07-55243) and Order of Contempt (No. 07-56574) REVERSED.

FN1. The CWA is codified at 33 U.S.C. §§ 1251-1387. More particularly, the claims were brought under 33 U.S.C. §§ 1311, 1342, and 1344.

FN2. The ESA is codified at 16 U.S.C. §§ 1531-1544. More particularly, the claims were brought under 16 U.S.C. §§ 1538 and 1540.

FN3. As used here, rip-rap is rock; it is used to protect shorelines against erosion.

FN4. Notices were issued on June 30, 2003, July 17, 2003, August 8, 2003, and December 1, 2003.

FN5. *Ctr. for Biological Diversity v. Marina Point Dev. Assocs.,* 434 F.Supp.2d 789 (C.D.Cal.2006) (*Center I*).

FN6. 33 U.S.C. § 1365(b)(1)(A)(iii).

FN7. *Id.* § 1365(b)(1)(A)(i). The Administrator is the Administrator of the Environmental Protection Agency (EPA). 33 U.S.C. § 1251(d).

FN8. 33 U.S.C. § 1365(b)(1)(A)(ii).

FN9. 33 U.S.C. § 1344.

FN10. 33 U.S.C. § 1342.

FN11. That is especially problematic here because it is doubtful that Marina Point's own land was itself wetlands at all. *See, e.g.,* 33 C.F.R. § 330.3; *United States v. S. Inv. Co.,* 876 F.2d 606, 613 (8th Cir.1989). The Corps did not (and does not) think so. Marina Point could hardly have guessed at what the Center was speaking about.

FN12. It is interesting to note that even in its complaint and in the ultimate pretrial conference order in this action in the district court, there is no mention of a § 402 claim.

FN13. The judgment was entered August 21, 2006.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2008 WL 3009692                                                                                                          Page 10
--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204
**(Cite as: 2008 WL 3009692 (9th Cir.(Cal.)))**

FN14. *See* Endangered & Threatened Wildlife & Plants; Removing the Bald Eagle in the Lower 48 States From the List of Endangered & Threatened Wildlife, 72 Fed.Reg. 37,346 (July 9, 2007).

FN15. *See Friends of Yosemite Valley v. Norton,* 348 F.3d 789, 793 (9th Cir.2003); *see also Silver v. Executive Car Leasing Long-Term Disability Plan,* 466 F.3d 727, 732-33 (9th Cir.2006).

FN16. The mere fact that the Center achieved a preliminary injunction will not support an award of fees. *See Sole v. Wyner,* --- U.S. ----, 127 S.Ct. 2188, 2195, 167 L.Ed.2d 1069 (2007) ("Prevailing party status, we hold, does not attend achievement of a preliminary injunction that is reversed, dissolved or otherwise undone by the final decision in the same case.")

FN17. *See A & M Records, Inc. v. Napster, Inc.,* 284 F.3d 1091, 1098-99 (9th Cir.2002); *Mayweathers v. Newland,* 258 F.3d 930, 935 (9th Cir.2001).

FN18. We do note that even if we were required to consider the merits of that order, it would necessarily have to be set aside. It is plain that no development on the project site took place. And it is equally plain that Marina Point did not fail to take measures directed by the Corps. In short, Marina Point cannot be said to have violated the terms of the judgment at all, much less to have done so contemptuously.

FN19. The district court's opinion is also vacated. *See Center I,* 434 F.Supp.2d at 789.

--- F.3d ----, 2008 WL 3009692 (9th Cir.(Cal.)), 08 Cal. Daily Op. Serv. 10,204

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.