Jack Silver, Esquire SBN# 160575
Law Office of Jack Silver
Jerry Bernhaut, Esquire SBN# 206264
Post Office Box 5469
Santa Rosa, California 95402-5469
Telephone: (707) 528-8175
Facsimile:  (707) 528-8675
lhm28843@sbcglobal.net

Attorneys for Plaintiff
NORTHERN CALIFORNIA RIVER WATCH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHERN CALIFORNIA RIVER WATCH, a non-profit corporation,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>UNION PACIFIC RAILROAD COMPANY, WEST COAST METALS, INC., and DOES 1-10, Inclusive,<br><br>　　　　　Defendants.<br>_____/ | CASE NO.  C08-01256 MMC<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT UNION PACIFIC RAILROAD COMPANY'S STATEMENT OF RECENT OPINION**<br><br>Date:　　August 29, 2008<br>Time:　　9:00 a.m.<br>Ctrm:　　7<br>Judge:　　Hon. Maxine M. Chesney |

**I.　INTRODUCTION**

On August 25, 2008 Defendant Union Pacific Railroad ("UPR") submitted to the court a Statement of Recent Opinion regarding an opinion recently issued by the Ninth Circuit in *Center for Biological Diversity v. Marina Point Development Co.,* No. 06-56193, 07-55243, 07-56574, ---F.3d---, 2008 WL 3009692 (9th Cir. August 6,2008), pertaining to UPR's pending Motion to Dismiss in the above-captioned matter.. The decision was attached without comment or analysis.   Below is an analysis by Plaintiff Northern California River Watch ("River Watch") showing why the Ninth Circuit's decision in *Marina Point* does not support UPR's Motion to Dismiss in the instant case.   The analysis below only addresses the adequacy of River Watch's Clean Water Act ("CWA") Notice letter.   Neither

Defendant UPR nor Defendant West Coast Metals, Inc. attacked the adequacy of River Watch's Resource Conservation and Recovery Act ("RCRA") Notice letter regarding subject matter jurisdiction under FRCP 12(b)(1) in their briefs supporting their Motions to Dismiss.

## II. ANALYSIS

In *Marina Point* the court held that Plaintiff's Notices of Intent To Sue under the CWA ("CWA Notices") were insufficient under the citizen suit notice requirements of the CWA with regard to the required specificity under 40 C.F.R § 135.3. *Marina Point* involved a condominium development project by Defendant Marina Point Development Associates ("Marina Point") on the north shore of Big Bear Lake and the east shore of Grout Bay in the San Bernardino Mountains. Development was proceeding under a permit issued by the Army Corps of Engineers ("the Corps") authorizing Marina Point to strengthen the existing shoreline and engage in defined dredging activities, while prohibiting the placement of rip-rap at elevations below lake contours, the deposit of sand below the ordinary high water mark and transferring fill or structures to neighboring wetlands. The Corps allowed Marina Point to proceed with dredging after the permit had expired as long as the dredging did not result in more than "incidental fallback" of soil below the high water mark. Work continued until about July 23, 2003 when the Corps issued a Cease and Desist Order because the activities had resulted in more than incidental fallback of soil and stockpiling of material below the high water mark. The Corps subsequently issued an Initial Corrective Measure Order requiring specific remedial actions before Marina Point could resume work on the project. Marina Point completed the required remedial actions within a slightly extended deadline granted by the Corps.

The Plaintiff, Center for Biological Diversity, a coalition of local residents ("the Center"), served its first CWA Notice on June 30, 2003, less than 60 days prior to the Corps issuing the Cease and Desist Order. The Center served three additional CWA Notices prior to filing its CWA action. The court, finding the CWA Notices insufficient under 40 C.F.R § 135.3, emphasized both the lack of specific information regarding the alleged violations and the practical purposes of the notice requirement identified by the Supreme Court in *Hallstrom v. Tillamook County,* 493 U.S. 20, 29 (1989), i.e.

1 providing an opportunity for self-correction by the alleged violator and intervention by government
2 agencies to enforce regulations. In reviewing the content of the CWA Notices, the court referred to
3 statements in the first notice that,
4 " 'Section 404 of the CWA' was being violated by activities that began June 17, 2003, which activities
5 were placing 'enormous amounts of fill' into the lake and were accompanied by grading below the
6 ordinary high water mark ". (see *Marina Point* at p. 6 ) The court found subsequent CWA Notices even
7 less descriptive, citing the third notice's reference to "piles of material that were causing discharges
8 below the ordinary high water mark of the lake, and declaring that the situation could be made worse
9 should it rain", *id* at p. 6. While the language of the CWA Notices is not quoted at length in the opinion,
10 it is clear that the CWA Notices contained minimal detail regarding the activity constituting the
11 violations and the specific regulations being violated.
12      The court made clear that its primary rationale for finding lack of jurisdiction was its
13 determination that the violations alleged in the CWA Notices were adequately addressed in a timely
14 manner by regulatory action by the Corps and a corrective action by Marina Point prior to the Center
15 filing its action; " What is of even more significance, however, is that long before any action was filed
16 and, in fact, before sixty days had gone by [after service of the first notice] the Corps issued its Cease
17 and Desist Order on July 23, 2003, and all Activity by Marina Point regarding the lake stopped as it had
18 to" ( *id* at p.6), " That is to say, in light of the defects in the notices, and in light of the fact that the Corps
19 and Marina Point did act to cease the activities that the Center claimed were wrongful and even acted
20 to effect ongoing repairs for any problems caused by past activities, the district court did not have
21 jurisdiction to hear the CWA action" (*id* at p.7)
22      By contrast, River Watch's CWA Notice in the instant case contains more than sufficient detail
23 to enable UPR to identify the activity constituting the alleged violations, the specific standard, limitation,
24 or order alleged to have been violated, and the necessary corrective actions. The CWA Notice details
25 1) the sources of the alleged contamination,
26
27 C8-01256 MMC
28 PLAINTIFF'S RESPONSE TO DEFENDANT UNION PACIFIC RAILROAD COMPANY'S
STATEMENT OF RECENT OPINION                                                                                  3

"In June, 1979 Southern Pacific Transportation Company leased the Site to West Coast Metals, Inc. which used the Site for metal salvage recycling operations, including purchase of metal waste material from industrial businesses and sorting, condensing, and re-sale of metal scrap. A hydraulic press was used to flatten automobiles. Aerial photographs of the Site, taken during the time of West Coast Metals. Inc.'s lease, show the former disassembly building, the tractor trailer beds for storage of metals, large cylindrical storage containers, and numerous stockpiles of miscellaneous parts, tanks, cars and other debris scattered over the entire Site." (CWA Notice p.2-3) ,

2) the conditions constituting the alleged contamination,

"Results of on-going monitoring and investigation of the Site confirmed the presence of halogenated organic compounds in groundwater extending approximately one-half mile to the west of the Site. Chemicals found in groundwater in the area investigated include trichloroethylene ("TCE") at up to 23,000 parts per billion (ppb), 1,l.l-trichloroethane at up to 5,800 ppb, freon 113 at up to 19,000 ppb, benzene at up to 18 ppb and other related volatile organic compounds ("VOCs"). Other compounds previously detected in groundwater include heavy metals and fuel constituents.

Extensive domestic well sampling was conducted during 1991 and 2002, primarily in the area west of the Site. In 1991 laboratory results revealed VOCs contamination in groundwater in 33 residential wells, including TCE at up to 150 ppb. In 2002 laboratory results revealed VOCs contamination in groundwater in domestic wells, including TCE at up to 36 ppb. The Site is located within 1,000 feet of a large, City of Santa Rosa municipal well, which was found to be contaminated with TCE, 1,11-trichloroethane, freon 113. and 1,1-dichloroethene.

The Site is in the vicinity of Santa Rosa Creek, a tributary of the Russian River. Pollutants discharged from the Site migrate through ground water tributaries into Santa Rosa Creek and the Russian River, both waters of the United States." (CWA Notice, p.3),

and 3), the regulations being violated,

"From July 31, 2002 through July 31, 2007, Polluters have violated the Clean Water Act, the Basin Plan and the Code of Federal Regulation for discharging pollutants into waters of the United States without an NPDES permit. Polluters have also caused waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the State of California and the United States, and creates a condition of pollution or nuisance. Continuing discharges as identified herein are in violation of the Clean Water Act, the Porter-Cologne Water Quality Control Act and provisions of the Water Quality Control Plan for the North Coast Region ("Basin Plan"). . . .

Water quality objectives in the Basin Plan are adopted to ensure protection of the beneficial uses of water. The most stringent water quality objectives for protection of all beneficial uses are selected as the protective water quality criteria. Alternative cleanup and abatement actions must evaluate the feasibility of, at a minimum: (a) cleanup to background levels, (b) cleanup to levels attainable through application of best practicable technology, and (c) cleanup to protective water quality criteria levels.

Discharge prohibitions contained in the Basin Plan apply to this Site. State Water Resources Control Board Resolution 68-16 (Statement of Policy With Respect To Maintaining High

Quality of Waters in California) applies to this Site. State Water Resources Control Board Resolution 92-49 also applies to this Site and sets forth Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Section 13304 of the California Water Code" (CWA Notice p. 5 and 6)

River Watch's CWA Notice refers to regulatory orders and monitoring results cited above, all of which are contained in UPR's own records. "When the plaintiff has gathered the information supporting its suit from the defendant's own submissions to the relevant state agencies and cites those submissions in the notice letter, the plaintiff has satisfied the notice requirement, and a district court possesses subject matter jurisdiction over the case." *Friends of Frederick Seig Grove v. Sonoma County Water Agency*, 124 F. Supp. 2d 1161,1169 (U.S. Dist. Ct., Northern Dist. of California, 2000).

Finally, River Watch's CWA Notice clearly states that actions by regulatory agencies and Defendants to date have not adequately addressed the alleged violations and resulting harm,

> "On February 7, 1994, Polluters began operating an on-site groundwater extraction and treatment system as an interim remedial measure. On November 2, 1994 they added an off-site extraction and treatment system. Together, the treatment system includes 9 on-site extraction wells and 4 off-site extraction wells. The interim remedial system involves extraction and treatment of contaminated groundwater from the upper 3 water-bearing zones. Groundwater is treated in an air stripper to remove VOCs. River Watch contends that further remedial actions are necessary for effective cleanup of all impacted aquifers." (CWA Notice, p.3)

### III. CONCLUSION

Considering the far superior level of detail in River Watch's CWA Notice to the *Marina Point* CWA Notice and the fact that twenty years have passed since the first enforcement action was issued against the site owned by UPR in this case, and high levels of contamination are ongoing, it is clear that River Watch's CWA Notice falls well on the side of granting jurisdiction under the balance between encouraging citizen enforcement and avoiding excessive citizen suits articulated by the Supreme Court in *Hallstrom*.

Dated: August 28, 2008                    Respectfully submitted,

                                                 */s/ Jerry Bernhaut*
                                                 JERRY BERNHAUT
                                                 Attorney for Plaintiff
                                                 NORTHERN CALIFORNIA RIVER WATCH