Jack Silver, Esq. SBN: 160575
Law Office of Jack Silver
Jerry Bernhaut, Esq. SBN: 206264
Post Office Box 5469
Santa Rosa, CA 95402-5469
Tel. (707)528-8175
Fax. (707)528-8675

Attorneys for Plaintiff
NORTHERN CALIFORNIA RIVER WATCH

Melissa B. Hagan (SBN: 17225200 (Texas))
Union Pacific Railroad Company
Law Department
1001 McKinney St., Ste. 900
Houston, Texas 77002
Direct: (713) 220-3207
Fax:    (713) 220-3215
mbhagan@up.com

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHERN CALIFORNIA WATCH, a non-profit Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, WEST COAST METALS, INC., and DOES 1-10, Inclusive,<br><br>    Defendants. | CASE NO.  C08-01256 MMC<br><br>**CONSENT DECREE AND ORDER** |

WHEREAS, on or about March 4, 2008 plaintiff Northern California River Watch, a non profit corporation, on behalf of itself and its members ("River Watch"), and after serving a Notice of Intent of Filing Suit on defendants West Coast Metals, Inc. ("WCM"), Union Pacific Railroad Company ("UPR") and the appropriate governmental agencies, filed its Complaint in the above-entitled action alleging defendants, WCM and UPR were in violation of the Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6901 *et seq.* in conjunction with the continuing pollution at real property located at

99 Frances Santa Rosa, California ("Action"); and,

WHEREAS the Complaint requests declaratory and injunctive relief, the imposition of civil penalties for each violation of the aforementioned laws and statutes, and an award to River Watch of its litigation costs, including reasonable attorney fees and costs; and,

WHEREAS on March 3, 2009, River Watch served a Notice of Intent to File Suit under the RCRA on WCM, Richard L. Bradley, West Coast Scrap Producers, Inc., and Optical Coating Laboratory, Inc. for violations of RCRA 42 U.S.C. § 6901 *et seq.*, at real property located at 1143 Briggs Avenue, Santa Rosa, California, an adjoining parcel to the 99 Frances Street site; and,

WHEREAS UPR is under a Cleanup and Abatement Order from the Regional Water Quality Control Board ("RWQCB") directing it to remediate the 99 Frances street site; and,

WHEREAS, on June 22, 2009 River Watch and UPR and their respective counsel initially met with mediator William Nagle which mediation subsequently lead to resolution of all disputes against UPR; and,

WHEREAS River Watch and UPR agree that it is in their mutual interests to enter into this Consent Decree setting forth the terms and conditions appropriate to resolving the allegations set forth in the Complaint; and,

WHEREAS this Consent Decree constitutes a full and final adjudication of all claims in this action arising from or relating to the allegations in the Complaint that were, or could have been asserted against UPR, for alleged pollution at either the Briggs Avenue or Frances Street sites and is not an admission of jurisdiction over or liability for any claims or an admission of any fact; and,

WHEREFORE, River Watch and UPR have consented to the entry of this Consent Decree and Order without trial of any issues and hereby stipulate that in order to settle the claims alleged against UPR in the Complaint, this Consent Decree should be entered.

### PREAMBLE

UPR currently owns property located at 99 Frances Street, Santa Rosa, California (APN 38-012-11), hereinafter the "Site." UPR is the successor in interest to Southern Pacific Transportation Company. Southern Pacific Transportation Company was formerly known as Northwestern Pacific Railroad Company.

In 1967 Northwestern Pacific Railroad Company leased the Site to West Coast Welders Supply which operated the Site as a scrap met facility. Improvements to the Site included a 60-foot truck scale, a disassembly building and material storage areas. Operations at the Site included disassembly of automobiles, steam cleaning of trucks and automobile parts, and storage of metals, batteries, transformers, and miscellaneous refuse. These operations were located for the most part on the northern portion of the Site as shown by aerial photographs from the City of Santa Rosa Department of Public Works for the period 1970 through 1977. West Coast Welders Supply operated the Site as a scrap metal facility until June of 1979 at which time the lease was terminated.

In June, 1979 Southern Pacific Transportation Company leased the Site to WCM, which used the Site for metal salvage recycling operations, including the purchase of metal waste material from industrial businesses and sorting, condensing, and resale of the metal scrap. A hydraulic press was used at the Site to flatten automobiles. Aerial photographs of the Site taken during the time of WCM's lease show the former disassembly building, the tractor trailer beds for storage of metals, large cylindrical storage containers, and numerous stockpiles of miscellaneous parts, tanks, cars and other debris scattered over the entire Site. In 1986, the lease was terminated, and WCM abandoned its operations.

River Watch alleges the use and storage of scrap metal, automobile parts and industrial metal waste by UPR and the operators of the Site has resulted in the leaching into soil and groundwater of halogenated organic compounds, toxic metals and other pollutants at the Site, which has and continues to violate permits, standards, regulations, conditions, requirements or prohibitions regarding storage of pollutants pursuant to the RCRA.

River Watch alleges operations at the Site by UPR and the operators have caused contamination of soil and groundwater, which presents an imminent and substantial endangerment to human health and the environment.

The RWQCB issued Cleanup and Abatement Orders ("CAO") on July 11, 1988 to Southern Pacific Railroad, West Coast Welders Supply, and WCM. The most recent CAO was issued in 2006 and it still in force. The most recent National Pollution Discharge Elimination System Permit was issued June 29, 2006.

The Site is located adjacent to property at 1143 Briggs Avenue. The property at 1143 Briggs Avenue is subject to separate enforcement orders of the RWQCB issued to Richard L. Bradley, West Coast Scrap Producers, Donald S. Kesler and Ethel J. Kelser, Irving Kesler and William Whitman, and WCM. River Watch alleges the contamination originating on the 1143 Briggs Avenue site appears to be co-mingled with the contamination originating on the 99 Frances Street Site. In January, 2006 WCM entered into a settlement agreement with UPR.

A total of forty-two monitoring wells, thirteen groundwater extraction wells, and eleven piezometers have been installed on and off-site by UPR. Groundwater monitoring activities have been conducted. Results of on-going monitoring and site investigation confirmed the presence of halogenated organic compounds in groundwater extending approximately one- half mile to the west of the Site. Chemicals found in groundwater in the area investigated include trichloroethylene (TCE) at up to 23,000 parts per billion (ppb), 1,1,1-trichloroethane at up to 5,800 ppb, Freon 113 at up to 19,000 ppb, benzene at up to 18 ppb and other related volatile organic compounds (VOCs). Other compounds previously detected in groundwater include heavy metals and fuel constituents.

During 1991 and 2002 domestic well sampling was conducted primarily in the area west of the Site. In 1991 laboratory results revealed VOC contamination in groundwater in 33 residential wells, such as TCE at up to 150 ppb. In 2002 laboratory results revealed VOC contamination in groundwater in domestic wells such as TCE at up to 36 ppb. The Site is located within 1,000 feet of a large, City of Santa Rosa municipal well which was found to be contaminated with TCE, 1,1-trichloroethane, Freon 113, and 1,1-dichloroethene.

As an interim remedial measure, on February 7, 1994, UPR began operating an on-site groundwater extraction and treatment system. On November 2, 1994 UPR added an off-site extraction and treatment system. Together, the treatment system includes nine on-site extraction wells and four off-site extraction wells. The interim remedial system involves extraction and treatment of contaminated groundwater from the upper three water-bearing zones. Groundwater is treated in an air stripper to remove VOCs. Further remedial actions are necessary for effective cleanup of all impacted aquifers.

UPR submitted the April 15, 2002 *Draft Pilot Study Work Plan* and the March 24, 2005 *Addendum to Pilot Study Workplan* to the RWQCB. The Work Plan and Addendum propose the scope of work and a schedule for conducting an in-situ bioremediation pilot study for remediation of chlorinated VOCs at the Site. UPR claims that data generated during the pilot study will be evaluated to determine an appropriate final remedial action to achieve water quality objectives within a reasonable time frame. UPR submitted the *In Situ Remediation Pilot Study Report* on May 14, 2007. UPR submitted the *Interim Remedial Action Workplan* on August 14, 2007 and the *Soil Vapor Work Plan* on December 28, 2007. On *July 18, 2008,* UPR submitted the *On-Site Soil Vapor Survey and Groundwater Investigation Report* to the RWQCB.

## **TERMS OF CONSENT DECREE**

**A.   UPR AGREES TO**

    1.    Cooperation with Current Action Against Other Parties

        a.    With proper notice and upon written request and without subpoena, UPR shall provide River Watch with documents and access to witnesses, which would have been available through discovery in this matter and within the control of UPR for the purposes of gathering discoverable materials for use by River Watch in its continuing case against any other parties in the Action. River Watch will be responsible for the costs of reproducing any documents it has examined, selected and set aside for copying or reproduction and for the time of any witnesses.

        b.    Documents refer to a writing as defined in the California Evidence Code and include the original or a copy of handwriting, typewriting, printing, photocopying, photographic representations, and every other means of recording upon any tangible thing including through the use of computers or other electronic device and form or communicating or representation, and shall include but not be limited to letters, memos, photographs, videotapes, sounds, symbol or any combination thereof

        c.    Witnesses within the control of UPR include the UPR itself, its agents, officers, employees, board members, experts, consultants, engineers, contractors and attorneys.

    2.    Projects

UPR shall complete, if it has not already completed the following Projects, subject to prior approval

by any and all regulatory agencies asserting jurisdiction over the Site. UPR shall provide NCRW with evidence of the completion of the Project within the time specified. UPR reserves the right to determine (with regulatory agency approval) the methodology and techniques used to complete each Project. The Parties further agree that the Consent Decree does not impact the authority of any regulatory agency to determine whether a Project is needed, the scope of a Project, and if the specified Project is complete.

    a. Force Majeure

Separate from, and in addition to any other limitations on the UPRs obligations under this Consent Decree, UPR's obligation to comply with one or more of the provisions of this Consent Decree shall be deferred to the extent and for the duration that the delay in compliance is caused by an event or circumstances beyond the reasonable control of UPR or any entity controlled by UPR, including its contractors, and that could not have been reasonably foreseen and prevented by the exercise of due diligence by UPR. Delays due to unanticipated or increased costs or expenses associated with the completion of any work or activity under this Consent Decree, changed financial circumstances, or UPR's failure to make timely and bona fide applications and to exercise diligent efforts to obtain permits, or normal inclement weather shall not, in any event, be considered to be circumstances beyond UPR's control.

    b. Aquifer Profile Study

        i. UPR shall provide River Watch with aquifer profiles identifying underlying water bearing strata and their communication with the A, B, and C zone aquifers. If aquifer profiles have not been completed, UPR shall complete the profiles within one year of the effective date of a settlement agreement.

        ii. UPR shall test the underlying water bearing strata determined to be in communication with the A, B, or C zone aquifers for all Pollutants, as defined in the July 2009 Semi-Annual Groundwater Monitoring Report, Table 2.2 or as modified by the regulatory agency asserting jurisdiction, at the Site. Testing will be completed within one year of the effective date of a settlement agreement.

///

///

    c. Conduit/Preferential Pathway Study

        i. UPR shall conduct a conduit/preferential pathway study identifying all conduit or preferential pathways such as sand and gravel lenses, utilities, roads, services and other potential pathways for pollution migration for the Site. The conduit/preferential pathway study is to be completed within one year of the effective date of a settlement agreement.

        ii. UPR shall test all conduits/preferential pathways found to have intersected the plume at the Site. Testing is to be completed within one year of the effective date of a settlement agreement.

    d. Testing of Domestic Wells

        i. Until the Site is closed, all the monitoring wells register below Maximum Contaminant Levels, or all residents with contaminated wells are connected to City of Santa Rosa water, UPR shall regularly test all domestic wells at intervals frequent enough to capture analytical results at different seasonal water table levels.

        ii. If domestic well testing register above Maximum Contaminant Levels, UPR will employ additional technologies to remediate the contamination.

    e. Surface Water Testing

Within one year of the effective date of a settlement agreement UPR shall conduct a study to determine whether the Site has impacted surface waters.

    f. Vapor Entrapment Study

Within one year of the effective date of a settlement agreement UPR shall complete a vapor entrapment study of the buildings at the Site and buildings located off-site. UPR is not responsible for measuring vapor entrapment on properties to which they have been refused permission following a written request for access.

///

///

g. Metals Analysis

Within one year of the effective date of a settlement agreement UPR shall conduct a metals study at the Site, which will include all metals with a reasonable potential of being contaminants, other than lead.

h. 1,4-dioxane Investigation and Remediation

Within one year of the effective date of a settlement agreement UPR shall develop a study to address 1,4-dioxane contamination at the Site.

i. Updated Remediation Plan

Within two years of the effective date of a settlement agreement UPR shall develop an updated Remedial Action Plan based on the results of tests and studies performed above, which will control Pollutants at the Site.

j. Project Coordination with Lead Environmental Agency

Should the implementation by UPR of the Projects set forth above not take place within the deadlines set, despite the timely good faith efforts of UPR to acquire the necessary permits(s), approvals(s), reviews or other necessary steps by the supervising Federal, State, or Local agency or agencies, or due to factors unforeseen at the time of this Consent Decree was entered into, UPR agrees to meet and confer with lead environmental agency staff to modify, by agreement, the deadlines set forth in the Projects to reflect the necessary permitting process(es) or other basis for delay. UPR shall notify River Watch in writing as soon as the potential failure to comply becomes apparent, in any case not less than twenty days prior to any deadline set forth in the schedule, and shall describe the reasons for the potential delay.

**B.   PAYMENT OF FEES AND COSTS**

1. Within thirty (30) days of the effective date of a settlement agreement UPR agrees to reimburse NCRW $50,000.00 for its costs including expert, paralegal and investigator fees and 15% of its attorney fees in the amount of $38,000.00. NCRW will provide UPR with an itemization of costs including expert, paralegal and investigator fees as well as total attorney fees incurred to date.

2. UPR shall pay for all mediation costs in this Action.

///

///

**C.   SUPPLEMENTAL ENVIRONMENTAL PROJECT**

UPR agrees to fund a Supplemental Environmental Programs (SEPs) to be administered by the Rose Foundation in the amount of $30,000.00. The funds shall be disbursed through the Rose Foundation's Northern California Environmental Grassroots Fund. The sole purpose of the SEPs will be for environmentally beneficial projects within the Santa Rosa Plain relating to habitat or creek restoration or for educational purposes only. No part of the SEP funds can be used to fund the preparation or conduct of advocacy or litigation of any kind.

**D.   RELEASES**

1.   Release of UPR by River Watch

In exchange for the considerations set forth herein, River Watch covenants not to sue and hereby releases and discharges UPR from (1) any and all claims, costs, expenses, damages or losses arising or relating to this lawsuit, and (2) any and all claims, costs, expenses damages or losses which River Watch could have asserted and could not assert based upon the allegations in the Complaint.

2.   Intended Scope of Release

To the fullest extent possible, this Consent Decree shall act as a full and final resolution of any and all environmental claims, actions, causes of action based on any statute or provisions of common law, whether legal or equitable, and all liability arising out of, or in any way related to, claims arising out of the operation of or discharges from the Site, which were raised or could have been raised in this litigation.

3.   Excepted Claims from Release

4.   The parties to this Consent Decree acknowledge and agree that the releases set out above do not apply to any action or claim by either party to enforce the terms of this Consent Decree.

5.   Waiver of Rights under Calif. Code Section 1542

6.   With respect to the claims release herein, each party to this Consent Decree expressly and specifically waives any rights and benefits available to that party under Calif. Civil Code Section 1542,

///

///

///

which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

### E. NON-PARTICIPATION IN FUTURE ACTIONS

River Watch agrees that neither River Watch (including, without limitations, its officers, executive staff, members of its governing board), nor any organization under the control o River Watch, its officers, its executive staff, or members of its governing board, will file any suit, claim or action against UPR for violations that were the subject of this lawsuit. River Watch agrees it will not support others suits, claims or actions, by providing financial assistance, personnel time or other affirmative actions against UPR that may be proposed by other groups or individuals with regard to the kinds of claims or violations that were the subject of this lawsuit.

### F. DISPUTE RESOLUTION

1. If River Watch believes UPR is in violation of this Consent Decree, River Watch shall notify UPR of the alleged violation(s) in writing. UPR shall then have thirty working days from receipt of that written notice to respond to the allegations. If UPR responds to the claim of violation(s) and River Watch determines that there is no violation or the claim of violation is resolved within forty-five days of River Watch's written notice of the alleged violation(s), River Watch shall take no further action against UPR. If UPR denies or fails to resolve the claim of violation, the parties shall meet and confer within fifteen days of the date for UPR's response. If the parties cannot informally resolve the conflict, the parties shall submit the matter to the Arbitrator, William Nagle, within thirty (30) days or as soon as reasonably possible after the date they informally met and conferred. If the Arbitrator, William Nagle is unavailable, the parties shall select a new Arbitrator within thirty (30) days or as soon as reasonably possibly after they learn William Nagle is unavailable.

2. The Arbitrator's fees shall be equally shared by both Parties.

3. The Parties agree that the Arbitrator's decision is final and unappealable.

///

///

**G.   NO ADMISSIONS**

This Consent Decree shall not constitute, and no action taken pursuant to this Consent Decree shall constitute, any admission of fact, liability, causation, responsibility or fault, or proportionate share thereof, by any party with respect to any matter referred to herein. This Consent Decree shall not be used by any party in any administrative or judicial action or proceeding, or in any arbitration or alternative dispute resolution proceeding for any purpose, except for the purpose of establishing its terms in any action to enforce the terms of this Consent Decree.

**H.   AUTHORITY OF REPRESENTATION**

Each of the parties to this Consent Decree represents and warrants that the person(s) executing this Consent Decree on its behalf is a representative duly authorized to bind it and is empowered to enter into this Consent Decree on its behalf.

**I.   NOTICES**

Any notice required or permitted to be given pursuant to this Consent Decree shall be in writing and shall be deemed to be given when served personally, by facsimile, email or on the fifth day after mailing if mailed by United States mail, postage prepaid, and addressed to the address for each party as set forth below:

**J.   COUNTERPARTS AND FACSIMILE SIGNATURES**

Each signatory of this Consent Decree signing on behalf of another, warrants that he or she has the authority to sign on behalf of said person or entity and on behalf of all persons covered by this Consent Decree. This Consent Decree may be executed in counterparts with each counterpart being interpreted as an original. Any party may transmit its execution of this Consent Decree by facsimile, in which case such party shall provide the original execution page within three business days to all other parties. A party's execution page transmitted by email or facsimile may be used as though it were an original signature notwithstanding the fact that the party did not provide an original signature.

///

///

**K.  ADVICE OF ATTORNEYS**

Each party herein has evaluated its respective position with regard to this matter through its own investigation and through its attorneys. Each party acknowledges that it enters into this Consent Decree upon the advice of its respective attorneys, that it has read this Consent Decree, discussed it with its attorneys, that the terms and conditions of this Consent Decree are fully understood and that it freely and voluntarily enters into this Consent Decree.

**L.  CONSTRUCTION OF AGREEMENT**

The parties acknowledge that this Consent Decree is the product of informed negotiating among the parties, and if any part of this Consent Decree is deemed ambiguous or in conflict, it shall be construed as if it were drafted jointed by all parties.

**M.  ENTIRE AGREEMENT**

The parties warrant and agree that this Consent Decree constitutes the entire agreement between them concerning the subject matter hereof. Each party represents, warrants and agrees that no promise or agreement not expressed herein has been made to it; that in executing this Consent Decree, no party is relying on any statement or representation made by any other party, or any other party's representatives concerning the subject matter, basis or effect of this Consent Decree other than as set forth herein; and, that each party is relying solely on its own judgment and knowledge.

**N.  MODIFICATION**

The terms of this Consent Decree shall not be changed, revised, or modified except by a written instrument signed by the parties to this Consent Decree and shall not take effect until entered by the Court.

**O.  GENERAL PROVISIONS**

The contractual interpretation of this Consent Decree and all obligations, rights, privileges, and responsibilities under it shall be governed and construed in accordance with applicable federal law.

///

///

///

///

1. Nothing in this Consent Decree creates, nor will be construed as creating, any claim in favor of any person not a party to this Consent Decree.

2. This Consent Decree may be executed in two or more counterparts or in separate signature pages, each of which shall be deemed an original, but all of which, together, will constitute one and the same instrument.

3. Good faith and best efforts are an implied term regarding each party's duty to comply with the terms of this Consent decree and Order.

4. Each party consents to the entry of this Consent Decree and Order.

5. The Date of Termination of this Consent Decree shall be upon completion of the Projects as outlined in Section A.2.(b-i) unless modified by events described in the Force Majeure clause set out in Section A.2.a or in Section A.2.

6. The "effective date of a settlement agreement" shall be the date on which the Consent decree is signed by Judge Chesney.

The undersigned agree to the foregoing:

Dated: 11-10-09

Northern California River Watch,
Plaintiff

By: Margaret Bauccalupi
Board Pres.

Dated: November 9, 2009

Union Pacific Railroad Company
Defendant

By: David P. Young
David P. Young, National Environmental Counsel
Union Pacific Railroad Company

APPROVED AS TO FORM:

Dated: NOV. 10, 2009

_____
Jack Silver
Attorney for Plaintiff
Northern California River Watch

Dated: November 9, 2009

_____
Melissa B. Hagan
Attorney for Defendant
Union Pacific Railroad Company

**ORDER**

APPROVED AND SO ORDERED,

DATED: November 13, 2009

_____
Honorable Maxine M. Chesney
United States District Judge